UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

JOSE LUIS RODRIGUEZ,

                                   Plaintiff                    DECISION AND ORDER

-vs-                                                            13-CV-6360 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                   Defendant.
_____

APPEARANCES

For the Plaintiff:              Catherine M. Callery, Esq.
                                Empire Justice Center
                                One West Main Street, Suite 200
                                Rochester, New York 14614

For the Defendant:              Fergus John Kaiser, Esq.
                                Social Security Administration
                                Office of General Counsel
                                26 Federal Plaza, Room 3904
                                New York, New York 10278

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Jose Luis Rodriguez ("Plaintiff") for Social Security

Supplemental Security Income ("SSI") disability benefits.  Now before the Court is

Plaintiff's motion (Docket No. [#9]) for judgment on the pleadings and Defendant's

cross-motion [#10] for judgment on the pleadings.  Plaintiff's application is granted,

defendant's application is denied, and this matter is remanded to the Commissioner for

further administrative proceedings.

1

PROCEDURAL HISTORY

Plaintiff claims to be disabled due to "an intellectual disability, Diffuse Idiopathic Skeletal Hyperostosis [("DISH")][1] resulting in back and knee pain, and depression."[2]  On December 30, 2010, Plaintiff, who had not worked for many years, filed an application for SSI disability benefits, claiming to be disabled due to three conditions: "depression," "back problems" and "high blood pressure." (148).  The Commissioner denied the application.

On December 1, 2011, Administrative Law Judge David Begley ("the ALJ") conducted a hearing, at which Plaintiff appeared and testified, accompanied by his non-attorney representative, Doris Cortez ("Cortez").  Cortez maintained that Plaintiff was disabled because he met the requirements of Listing 12.05(C). (13)[3]  Plaintiff, who was 47 years old at the time,  testified with the assistance of an interpreter, although the ALJ observed that Plaintiff appeared to understand English, since he "respond[ed] to questioning, posed in English, before the translator provided the question to [him] in Spanish." (58)  On March 16, 2012, the ALJ issued a Decision (48-59), finding that Plaintiff was not disabled at any time between the date he filed for benefits and the date of the hearing.

---

[1]Diffuse idiopathic skeletal hyperostosis is "calcification or a bony hardening of ligaments in areas where they attach to [one's] spine." http://www.mayoclinic.org/diseases-conditions/diffuse-idiopathic-skeletal-hyperostosis/basics/definition/con-20024713

[2]Pl. Memo of Law, Docket No. [#9-1] at p. 1.

[3]Citations are to the Administrative Record unless otherwise indicated.

Plaintiff, through his representative, appealed to the Appeals Council, again arguing that he met the requirements of Listing 12.05(C), based on "depression, back pain, hypertension, and knee pain" (187-189), combined with an IQ score  "in the mild range of mental retardation." (187)  The Appeals Council declined to review the ALJ's determination. (1-4)

On July 11, 2013, Plaintiff commenced this action.  As will be discussed further below, Plaintiff maintains that the ALJ's decision was erroneous in several respects. First, Plaintiff maintains that the ALJ erred, at step two of the five-step sequential analysis described below, by finding that Plaintiff's intellectual disability is not "severe." Plaintiff further contends that the ALJ erred at step three of the sequential analysis, by finding that Plaintiff's intellectual disability does not meet the requirements for a listed impairment.  In that regard, whereas Plaintiff had previously argued, both to the ALJ and to the Appeals Council, that he met only the 12.05(C) listing, he now contends that he meets the listings for both 12.05(B) and 12.05(C).  Additionally, Plaintiff contends that the ALJ erred at the fifth step of the sequential analysis, by failing to include all of Plaintiff's limitations in a hypothetical question to the vocational expert ("VE") who testified at the hearing.  Specifically, Plaintiff maintains that the ALJ's hypothetical questions to the VE "failed to include . . . the significant limitations caused by [Plaintiff's] intellectual disability" and his illiteracy.[4]  Finally, Plaintiff maintains that the ALJ erred by failing to "adequately insure that the VE's testimony did not conflict with the Dictionary

---

[4]Pl. Memo of Law [#9-1] at pp. 25-26.

of Occupational Titles ("DOT").[5]   In that regard, Plaintiff maintains that although the VE

identified three jobs that Plaintiff could perform even with his impairments, the DOT

requirements for those jobs exceed Plaintiff's actual abilities.

VOCATIONAL HISTORY

Plaintiff did not complete high school, and has provided differing accounts as to

the highest grade-level that he completed.  When Plaintiff applied for SSI disability

benefits, he indicated that he had attended special education classes, and that the

highest grade he completed was the Fourth Grade, in 1979. (149).  At the hearing,

Plaintiff stated that he completed "just about third grade." (18)  Plaintiff's representative

admits that Plaintiff told his counselor that he completed ninth grade,[6] and school

records indicate that he was still in school as late as 1981 which, given his birthdate,

would typically correspond with him being in ninth or tenth grade.[7](182-183) (IEP, dated

May 7, 1981, for upcoming school year at Monroe High School)

As for work history, Plaintiff told the ALJ that he had worked in Puerto Rico, but

had never worked "on a regular basis" in the U.S. (14)  Plaintiff indicated that he had

worked part-time as a dishwasher in Florida for "about two and a half months." (14, 16)

Plaintiff's last reported income, in the amount of $1,725.80, was in 1999. (48) Plaintiff

also has reported income for 1984-1989 and 1993 (137-138), but has not provided any

---

[5]Id. at p. 26.

[6]Pl. Memo of Law [#9-1] at p. 5.  Specifically, the record indicates that Plaintiff said he left school in ninth grade and moved to Puerto Rico. (204)

[7]Plaintiff was born on November 28, 1964, and there is no indication that he was retained during any school year.  Assuming that he began kindergarten in the 1970-1971 school year, he would have been in ninth grade during the 1979-1980 school year.

information about such work, except insofar as he maintains that he worked "on and off" at a carwash between 1987 and 1989. (149).

Plaintiff stated that he left his part-time dishwashing job in Florida to come to Rochester to care for his father, who was in a wheelchair, because "there was nobody to take care of him and give him his medicine." (15)  Plaintiff's mother and step-father also live in Rochester.  Plaintiff apparently lived with his father and cared for him for several years.  However, Plaintiff's father died on February 2, 2005, and Plaintiff never sought work thereafter, purportedly because he was too distraught over his father's death. (15) ("I just wanted to be alone, crying all the time.")  When the ALJ asked Plaintiff how he supported himself, Plaintiff gave a vague, unresponsive answer. (15) ("I am surviving [INAUDIBLE] because that's who is helping me.")  When the ALJ asked Plaintiff why he cannot work now, Plaintiff responded: "Because [INAUDIBLE] I can not lift heavy stuff, my hands fall asleep or get numb and I can't do anything." (15) Similarly, when Plaintiff applied for benefits, he was asked how his "injuries, illnesses or conditions" affected his ability to care for himself, and he responded: "I can't do any heavy lifting or move in a certain way." (162)

## ACTIVITIES OF DAILY LIVING

At the time of the hearing, Plaintiff was 47 years of age. (14).  Plaintiff weighed approximately 300 pounds, and is 5' 9" tall. (14)  At the hearing, Plaintiff stated that he consumes alcohol only occasionally, such as when there is a family party. (25) However, Plaintiff told a consulting psychologist that he consumes four 40-ounce bottles of beer each day (238), which is the equivalent of thirteen 12-ounce bottles of beer.  Plaintiff also told the Appeals Council that he began to "abuse alcohol" after his

father died. (188)  Plaintiff told his mental health counselor that he smoked a pack of cigarettes per day (207), but at the hearing he told the ALJ that he had never smoked. (24-25)

Plaintiff lives alone[8] in a second-floor walk-up apartment, which is located over a restaurant, which is owned by friends of his. (24)  Plaintiff states that he spends "a lot of time" at the restaurant. (24)  At one time, Plaintiff belonged to a "group or club" of people calling themselves "Latin Folks," but the group disbanded. (24)  Plaintiff further indicated that he spent "time helping his friend who sells ices on the street." (264) Plaintiff also has friends come to his apartment to play dominoes. (24)  Plaintiff indicated that he "managed his symptoms by being active," but "avoid[ed] being out at night due to danger in the community." (286)[9]   On Sundays, Plaintiff goes to church. (24)  Plaintiff also told his counselor that he was "attending classes," but the record provides no further detail regarding such classes. (198)

On the other hand, Plaintiff contends that he cannot either sit or stand for long periods, and that he is most comfortable lying in bed. (21)  Plaintiff indicated that he spends many days lying in bed watching television. (22-23)

Plaintiff occasionally "sweeps" his apartment. (23)  Plaintiff bathes and dresses himself. (23) Plaintiff cooks his own meals, but states that he cannot lift a glass of water, "because it gets heavy." (22-23)  At the hearing, Plaintiff indicated that his

---

[8]Plaintiff maintains that he was never married and has no children.  The ALJ's decision refers to Plaintiff having a "father-in-law" (56), but it appears that the ALJ was referring to Plaintiff's step-father, about whom he testified. (17)

[9]The suggestion is that Plaintiff would go out at night more if the neighborhood was more safe. This seems inconsistent with Plaintiff's hearing testimony, that he does not go out because noise and activity makes him nervous. (23)

mother assists him with grocery shopping, and also washes his laundry. (23) Elsewhere in the record, Plaintiff indicated that he does his own shopping and laundry.[10]

At the hearing Plaintiff indicated that he had past legal problems consisting of "only traffic, nothing else." (25)  However, Plaintiff had previously indicated that he had been convicted of a felony. (132)  When the ALJ asked Plaintiff about this discrepancy, Plaintiff stated that he was convicted of a felony, but he provided a seemingly incorrect explanation as to the nature of the crime.  Specifically, he stated that the felony conviction arose from having "an open can of beer in the street" (25), which, the Court notes, is not a felony.  Plaintiff stated that he received six months of probation for the conviction. (25)  Plaintiff also indicated that in 2008 he was arrested and kept overnight for "for traffic tickets." (238)  An x-ray report dated December 16, 2009, indicates that Plaintiff has gunshot fragments in his left knee, though the record provides no further explanation of this phenomenon. (281)

Plaintiff previously had a driver's license, but does not have one presently. (17) For transportation, Plaintiff rides a bicycle, receives rides from his step-father, or takes other unspecified transportation. (17, 198)  Plaintiff stated that he will not take the bus, because it makes him nervous, since he is illiterate, and can only read or write his "name and [the] time." (26)

---

[10]For example, Plaintiff told consultative examiner Karl Eurenius, M.D., that he did his own laundry, and went shopping two-or-three times per week. (232)  Plaintiff also told Christine Jean-Jacques, Ph.D., that he did his own laundry and shopping. (240)

Plaintiff has alternately stated that he likes to go to the movies (233), and that he does not go to movie theaters, because he gets "nervous" due to the darkness and the large screen. (24)

Plaintiff "speaks to" his mother twice a day, and also sees her at her home and at church. (28)  Plaintiff stated that his mother "goes with" him when he is grocery shopping (23), but he did not indicate that he needed her help to do the shopping, or that she did the shopping for him.[11]  Generally, Plaintiff stated that his mother "helps [him] a lot," because she is "the only one that [he has]" since his father died. (28)

## MEDICAL EVIDENCE

Plaintiff's medical history was accurately summarized in the parties' submissions and need not be repeated here in its entirety.  As noted earlier, Plaintiff suffers from a number of conditions, including DISH, hypertension, mild intellectual disability and depression. The Court has reviewed the entire medical record, which generally indicates that Plaintiff's depression is well-controlled with therapy and, occasionally, trazodone for nightmares.  The record further indicates that while Plaintiff claims to have chronic back and knee pain, he manages such pain with Ibuprofen.  Plaintiff's hypertension is apparently controlled with medication and has no effect on his day-to-day activities.  The Court will summarize the pertinent records below.

The earliest records consist of five pages of school records, from the Rochester City School District, which appear to have been prepared in 1980 and 1981, when Plaintiff was a teenager.  One of the five pages is an immunization record. (185)  The

---

[11]In that regard, Plaintiff's response to the ALJ's straightforward question, "Okay, who does the grocery shopping?", was unresponsive, as were many of his other answers.

next document is a "Psychological Evaluation," apparently based upon testing conducted on January 2, 1980, and January 7, 1980, when Plaintiff was fifteen years old. (184)[12]   The document indicates that Plaintiff was administered the following exams: "Sp. WISC," "WRAT," "Bender" and "Figure Draw." *Id*.  However, the only test for which numeric scores are reported is the WRAT. *Id*.  For that exam, Plaintiff received a "3.6 (68)" for reading, "3.6 (68)" for spelling and "2.3 (61)" for arithmetic. *Id*.  The document also indicates that for the "Bender" test,[13] the person scoring the test commented, "5 deviations." *Id*.  The document further indicates that Plaintiff's strength was "object assembly," and that his weaknesses were "information, arithmetic, digit span, coding." *Id*.

Regarding this same document, Plaintiff maintains that although he did not receive a numeric score for the "Sp. WISC" exam, he received a letter score of "E," which, he maintains, means "Educable Mentally Retarded."[14]   However, the Court disagrees with that interpretation.  In the first place, Plaintiff has not cited any basis upon which to make a leap from the letter "E" to the phrase "Educable Mentally Retarded."  As to that point, the Court notes, from its own research, that "Educable Mentally Retarded" is, not surprisingly, usually abbreviated "EMR," not "E."  As further

---

[12]The document states that Plaintiff's C.A. is 15-1, which the Court interprets as a "chronological age" of fifteen years and one month, which, since Plaintiff's birthday is November 28, 1964, corresponds to the testing being performed in January 1980. (184)

[13]This apparently refers to the "Bender-Gestalt" test, or "Bender Visual Motor Gestalt Test," which is "a drawing test in which the subject copies geometric figures and which is used esp. to assess organic brain damage and degree of maturation of the nervous system." MERRIAM-WEBSTER'S MEDICAL DESK DICTIONARY (1993)

[14]Pl. Memo of Law [#9-1] at p. 18.

proof of this, contained within Plaintiff's school records is another report that uses the abbreviation "EMR," not "E," to refer to "educable mentally retarded." (186)  The Court further observes that a letter "E" also appears on the scoring form for two categories of test which Plaintiff was *not even administered*. (184) (WPPSI & WAIS)  It appears, therefore, that the letter E is either part of the pre-printed form, or an indication similar to "n/a", meaning "not applicable," or something else, but in any event is not an actual score that Plaintiff received.  Accordingly, the only actual reported scores on this particular form are the ones for the WRAT and Bender tests, discussed above.

The next school document is a "Yearly Progress Report," which, in separate columns, appears to summarize information from both the 1979-1980 school year and another year, the date of which is illegible, but which presumably is the following year, covering 1980-1981. (182)  The document is a grainy photocopy, apparently reduced in size and difficult to read.  However, the pertinent portion of each column, entitled "educational data," refers to the same testing, performed in January 1980, discussed above. *Id*.  That is, both columns indicate that a WISC exam was administered in January 1980. The column for the 1979-1980 school year has no numeric score, but appears to have only the letter "E." *Id*.  The next year's column indicates that Plaintiff was administered the "Spanish WISC," again in January 1980. *Id*.  As part of that entry, the entrant appears to have again written "E," but there is some additional writing, which is indistinct. *Id*.  On that point, Plaintiff argues that such writing indicates "an IQ score of 51,"[15] but he previously argued to the Appeals Council that the number was 57 (187),

_____

[15] See, Pl. Memo of Law [#9-1] at p. 3.

10

which only goes to show that the notation is illegible.  In any event, the Court disagrees

that the notation shows either a 51 or a 57, and finds that the first character could just

as easily be an "s," a "5" or something else entirely, while the second character is

completely indistinct. (182)[16]

Plaintiff's contention that he received a WISC score of 51 on the January 1980

testing is further belied by the contemporaneous psychological testing form on page

184 of the record which, as already discussed, did not set forth a numeric score.

Accordingly, even if the information on page 182 of the record purported to show a

WISC score of 51, which the Court does not believe it does, such number would have

been pulled out of thin air in any event, as far as this record is concerned, since the

contemporaneous test result from January 1980 contains no such numeric score.

Nevertheless, the "Yearly Progress Report" contains some notations concerning

Plaintiff's academic abilities.(182)  Specifically, the report contains these comments:

"Very slow in doing any work.  Refuses to do work which he believes is too hard for him.

Is very slow, but is quite polite + easy going.  Has a hard time completing even simple

tasks." *Id*.

The next school document is an Individual Education Program ("IEP") report

dated May 7, 1981, for the following school year. (183)  The IEP indicates that Plaintiff

will attend "regular classes" in the following subjects: Gym, English as a Second

Language, Art and Industrial Arts. *Id*.  The IEP also sets the following quite modest

goals: "Be able to read + comprehend a simple book.  Be able to read + know about 50-

---

[16]Pl. Memo of Law [#9-1] at p. 17.  Plaintiff previously argued to the Appeals Council that the number was 57. (187)  This contradiction points out the illegibility of the notation.

75 words in English.  Be able to recite almost all the x's tables.  Understand about juvenile crime + how it affects everyone.  Finish learning about maps + meters.  Learn more about First Aid + body functions." *Id*.  The form does not refer to any IQ or other testing data.

Lastly, the batch of school records contains a single-page, which, in addition to being untitled and undated, appears to this Court to be the final page of a longer document that is not included in the record in its entirety. (186)  It is also possible that the document is a contemporaneous addendum to, or summary of, the 1980 test results (184), though it does not say that.  The document was apparently written to be signed by "Wim Baars, Bilingual School Psychologist" and "Wilfred Newman, Certified School Psychologist," though it does not appear that either person actually signed the document. *Id*.  The document states, in pertinent part, the following:

> Jose was referred to the bilingual S.E.S. because he came recently from Puerto Rico and he speaks only Spanish.  There are some indications that he was in a Special Education program in Puerto Rico.
>
> Jose is a quiet, well behaved boy, who related well to the examiner.  Although his brother was involved in a problem just in front of the Office, Jose kept working without being distracted.
>
> \*\*\*
>
> According to the Spanish WISC, Jose is at the level of the mentally retarded.  His weakness[es] are Information, Arithmetic, Digit Span and Coding, which are very far below the expected level.  A relative strength is Object Assembly, in which he worked slightly below his age level.  Although 5 deviations are seen in the WRAT,[17] they do not constitute

---

[17]The author of (186) refers to the "5 standard deviations" comment as being in connection with the WRAT score.  However, as already discussed, the actual test result report lists the "5 deviations" comment after the *Bender* test result, not the WRAT.  Notably, there is no indication that the author of (184) was the same person who authored (186), nor does the record indicate that those two pages are

> serious perceptual problems.  His drawings are neat and well organized.
> For a boy his age, his HTP drawings are childish.  The WRAT scorings
> are commensurate with the WISC findings.
>
> ***
>
> Jose should be placed in an EMR group.  It would be ideal when his
> teacher is bilingual, because Jose does not speak English at all.

(186)

On September 5, 2007, Plaintiff was seen by Alefia Tapia, M.D. ("Tapia") to

follow up for hypertension and back pain, and to have a "DSS form filled out." (222)

Plaintiff reported having chronic back pain.  However, Plaintiff denied having any pain

radiating into his legs, or any numbness or weakness.  Plaintiff indicated that he took

ibuprofen "once in awhile," and that he had previously had physical therapy, which

helped him. *Id*.  Upon examination, Plaintiff had "mild paraspinal tenderness in the

lumbar region," but otherwise the examination was normal. *Id*.

Between 2009 and 2011, Plaintiff was seen on many occasions at Unity Health

System for ongoing treatment of depression, which he claimed was related to the death

of his father.  On April 8, 2009, Plaintiff told therapist Robyn Elliot ("Elliot") that his mood

had stabilized and that he was not experiencing nightmares. (215)  Plaintiff declined to

participate in grief counseling. *Id*.  Elliot reported that Plaintiff  was "responding well to

medications and . . . presenting as stable." (216)  Elliot conducted a mental status exam

that was unremarkable, except that Plaintiff seemed "passive." (216)  Elliot noted that

Plaintiff's cognition seemed "unremarkable," and that his judgment seemed "good." *Id*.

---

part of the same document.  While it is of course *possible* that the person who drafted (184) wrote the "5
deviations" comment in relation to the WRAT instead of Bender, in the space provided for comments after
the Bender test results,  there is no objective indication to that effect.

On January 4, 2010, Plaintiff told therapist Maria Hall ("Hall") that he had felt depressed for five years, since his father died. (200-201)  Plaintiff also stated that he had short-term memory problems. (201)  Plaintiff indicated that he had previously sought treatment for alcohol abuse, but had "been clean for 1-2 years." (201)  In that regard, Plaintiff indicated that he would consume "2 packs" of beer per day, to the point of "severe intoxication." (203)  Plaintiff stated that he smoked a pack of cigarettes daily. (207)  Plaintiff told Hall that he completed ninth grade. (204)  Hall reported that Plaintiff was "*mainly* Spanish speaking." (202) (emphasis added)  Plaintiff indicated that he was "independent" and "live[d] in his own apartment," and had "the support of his mother and sister." (206)  Plaintiff stated that he was "able to manage his depression," but still experienced crying spells and loneliness. (207) Hall conducted a mental status exam that was essentially normal, although Plaintiff claimed to sometimes hear "unspecified voices" and showed "mild" intellectual impairment. (205)

On January 20, 2010, Plaintiff told therapist Joann Rodriguez ("Rodriguez") that he was "keeping busy and attend[ing] classes," as well as "rid[ing] his bicycle for recreation." (198)  Rodriguez's mental status exam was normal, except that Plaintiff was "restless." (199)  Rodriguez did not report any cognitive deficits. *Id*. ("Cognition: Unremarkable")

On October 15, 2010, Plaintiff told psychiatrist Kevin McIntyre, M.D. ("McIntyre") that he had some stress concerning "family issues," but that his mood was nevertheless "good and stable". (271)  Plaintiff also indicated that he was sleeping well. *Id*. ("He reports sleep is good or excessive, taking trazodone some of the time.")  McIntyre conducted a mental status exam, which was normal, except that Plaintiff's "thought

14

form" was vague. (272)  McIntyre reported that Plaintiff showed "no apparent deficit" in cognition. *Id*.

On October 25, 2010, Hall reported that Plaintiff was stable and used medication only as needed. (275)

On November 8, 2010, Plaintiff told Hall that he was doing well. (196)  Plaintiff told Hall that he chose to be alone during the holidays that year so as to avoid "negative family relationships." *Id*.  Hall's mental status examination was unremarkable, except that Plaintiff had an abnormal gait and mild intellectual impairment. (197)

On November 29, 2010, Plaintiff told Hall that he was "doing well" and managing his depression. (194)  Hall reported that Plaintiff showed some increase in irritation and depression. *Id*.   Hall's mental status exam was unremarkable and his mood was euthymic, but he was also irritable. (195)  Notably, Hall observed no cognitive deficits. *Id*.

 On December 22, 2010, Plaintiff told Hall that he was "doing well." (192)  Hall reported that Plaintiff showed good insight, and was "positive and future oriented." *Id*. Hall's mental status exam was unremarkable, except she noted that Plaintiff had an abnormal gait and "mild" intellectual impairment. (193)

On January 14, 2011, Hall reported that, in general, Plaintiff's "functioning is somewhat delayed." (211)  Hall conducted a mental status exam, which showed that Plaintiff was experiencing feelings of sadness and worthlessness, along with mild intellectual impairment. (211)  Otherwise, though, the examination was normal. *Id*.

On January 17 2011, Hall reported that Plaintiff was "non-compliant [with treatment] at times, due to poor understanding of treatment needs." (219)

On January 19, 2011, Dr. Kumar, M.D. ("Kumar") reported that Plaintiff was complaining of back pain, and wanted disability forms filled out. (229)  Plaintiff claimed to have difficulty walking long distances. *Id*. Kumar indicated that Plaintiff had borderline intellectual function[18] and was a poor historian. *Id*.  Upon examination, Plaintiff had some tenderness and restriction of range-of-movement in the thoracic spine, but straight-leg raising test was negative. *Id*.

On February 8, 2011, consultative examiner Karl Eurenius, M.D. ("Eurenius") performed an internal medicine examination for the Commissioner. (232-236)  Plaintiff told Eurenius that he had experienced back pain since he was young, which was made worse by prolonged sitting or standing. (232)  Plaintiff also stated that he had knee pain, which was made worse by climbing stairs. *Id*.  Plaintiff reportedly told Eurenius that he lived alone and "dr[ank] beer every day." (232)  Plaintiff told Eurenius that he did his own laundry, and went shopping two-or-three times per week. *Id*.   Plaintiff reportedly stated that he liked to watch television, listen to the radio, ride his bicycle and "go to the movies."[19] (233)  Eurenius observed that Plaintiff appeared "somewhat disheveled," but was pleasant and in no apparent distress,  except that he limped slightly, favoring his right leg. (233)  Plaintiff had difficulty standing on his heels and toes, and squatting. *Id*.  Plaintiff needed help removing his shoes, but was able to rise

---

[18]According to Plaintiff, borderline intellectual functioning "is defined as an IQ between 71-84." Pl. Memo of Law [#9-1] at p. 3.

[19]Elsewhere in the record, Plaintiff stated that he does *not* like to go to the movies because it makes him nervous.

and get on and off the examination table. *Id.*  Upon examination, Plaintiff had some

tenderness in his lower-mid back, and claimed that it was painful to raise his arms

above ninety degrees. (234)  Plaintiff has no neurologic deficits, and exhibited full

strength in his upper and lower extremities. *Id.*  Eurenius's diagnosis was "chronic low

back pain, moderately severe," and "chronic shoulder pain." *Id.*  Eurenius noted that an

x-ray showed degenerative disease in the lumbar spine. *Id.*   Eurenius summarized his

findings as follows:

> In my opinion, he is limited in prolonged sitting, prolonged standing,
> climbing and ascending more than a flight of stairs, bending, lifting or
> carrying more than approximately 10 lb, or kneeling due to pain.  He also
> has some limitations in carrying, reaching or handling objects due to
> bilateral shoulder pain and failure to elevate shoulders beyond 90
> degrees.

(235)

On March 10, 2011, consultative psychologist Christine Jean-Jacques, Ph.D.

("Jean-Jacques") conducted a psychiatric evaluation. (237-241)  Jean-Jacques noted

that a family friend drove Plaintiff to the interview and translated for him. (237)  Plaintiff

told Jean-Jacques that he experienced difficulty falling asleep, and "usually" woke up

three-to-four times per night (237), which is contrary to what he told McIntyre.[20]  Plaintiff

told Jean-Jacques that he experienced sadness, "occasional hopelessness, loss of

interest in [his] usual activities, irritability, . . .  decreased energy with increased pain,

variable concentration and social withdrawal." (238)  Plaintiff indicated that he was

---

[20]Plaintiff told McIntyre, both before and after the exam by Jean-Jacques, that he slept well. Specifically, on October 15, 2010, Plaintiff told McIntyre that he was sleeping well. (271)  On September 9, 2011, Plaintiff said that he was sleeping "Ok and all night." (264)

generally sad about his father's death. *Id*.  Plaintiff also claimed to have short-term memory deficits. *Id*.  Plaintiff indicated that he drank "four, 40 ounce containers of beer on a daily basis." *Id*.  Jean-Jacques reported that Plaintiff was appropriately dressed and seemed "coherent and goal directed" without evidence of psychosis. (239) Plaintiff's affect was "full," and his mood was euthymic. *Id*.  Jean-Jacques observed that Plaintiff's attention and concentration seemed "mildly impaired as a result of limited intellectual functioning." *Id*.  Jean-Jacques found that Plaintiff's memory was intact. *Id*. Jean-Jacques reported that Plaintiff's cognitive functioning was "borderline,"[21] and that his insight and judgment were good. (240)  Plaintiff told Jean-Jacques that he had no difficulty with his "day-to-day" activities, such as "dressing, bathing, grooming, cooking and preparing food, general cleaning, laundry, shopping, managing money, or getting around the community." *Id*.  Plaintiff, and the friend who accompanied him to the examination, indicated that Plaintiff spent "most of his time alone." *Id*.  Plaintiff apparently told Jean-Jacques that on a "day-to-day basis," his daily activities might consist of simply "look[ing] out the window, watc[ing] TV, and listen[ing] to music." *Id*.[22] Jean-Jacques summarized her opinion as follows:

> The claimant appears capable of following and understanding simple
> directions and instructions, and performing simple tasks independently.
> The claimant's ability to maintain attention and concentration appears

---

[21]According to Plaintiff, borderline intellectual functioning "is defined as an IQ between 71-84." Pl. Memo of Law [#9-1] at p. 3.

[22]These statements to Jean-Jacques give an impression of isolation that is inconsistent with Plaintiff's description of his activities elsewhere in the record, in which, for example, he indicates that he spends a great deal of time with friends at the restaurant below his apartment (24), drinks beer (238), smokes (207), helps a friend with his business "selling ices" (264), goes to church (24), goes to the movies (233), participates in a social group (24), attends classes (198) and attends family parties. (25)

mildly impaired, most likely as a result of depression.[23]  The claimant appears capable of maintaining a regular schedule.  The claimant's ability to learn new tasks  and perform complex tasks independently or with supervision appear moderately impaired as a result of a history with difficulties learning, as well illiteracy in English and Spanish.  The claimant appears capable of making appropriate decisions, relating adequately others, and appropriately dealing with stress.

The results of this examination appear to be consistent with psychiatric and cognitive problems and these may significantly interfere with the claimant's ability to function on a daily basis.

(240)

On September 9, 2011, McIntyre met with Plaintiff to check his medications. Plaintiff indicated that he was sleeping well, "all night," and that his appetite was good. (264)  Plaintiff indicated that he rarely used Trazodone for sleeping, and McIntyre noted that Plaintiff had not filled his Trazodone prescription for almost a year. *Id*.   McIntyre indicated that Plaintiff had "depressive disorder [not otherwise specified]," which was "relatively stable and doing well on just [as needed] Trazodone." (265)  McIntyre conducted a mental status examination, which was generally normal, although he noted that Plaintiff's "thought form" was vague, his insight was superficial, and his judgment was fair. *Id*. McIntyre reported that Plaintiff's mood was euthymic, and that Plaintiff showed "no apparent deficit" in cognition. *Id*.

On September 12, 2011, Hall reported that Plaintiff was "anxious" to have his disability paperwork filled out. (283)  Otherwise, though, Plaintiff was "stable and ha[d] no other complaints." *Id*.  Hall observed that Plaintiff was "positive and future oriented."

---

[23]As noted earlier, when Plaintiff as tested at age fifteen, the examiner noted that Plaintiff showed good concentration when working. (186)

(284)  Hall conducted a mental status exam which was normal except that Plaintiff's gait was abnormal, his mood was "anxious," and he exhibited "mild" intellectual impairment. *Id*.

On September 23, 2011, Plaintiff told Hall that he was managing his depression symptoms by staying active. (286)  Hall conducted a mental status exam, and reported that Plaintiff's gait was abnormal, his insight was superficial, his judgment was fair, and he showed mild intellectual impairment. (287)  Otherwise, though, the exam was normal. *Id*.

On October 28, 2011, Hall reported that Plaintiff seemed "somewhat anxious," but was stable and had plans to help a friend whose wife had died. (293)[24]  Hall conducted a mental status exam, which was essentially unremarkable, except that Plaintiff seemed anxious, though euthymic, had thoughts of helplessness and showed mild intellectual impairment. (294)

On December 16, 2009, Plaintiff had x-rays of his spine and knees, based on his complaints of pain. (278-281)  An x-ray of the thoracic spine showed "multiple flowing syndesmophytes"[25] that were "most consistent with DISH" (278), which, as noted above, is a bony hardening of ligaments.  An x-ray of the lumbar spine similarly showed "large marginal osteophytes present surrounding the vertebral endplates. (279)  The radiologist's impression was "multilevel degenerative change with only minimal disc

---

[24]On October 28, 2011, Plaintiff told his therapist that he felt stress because his friend's wife had died. (293)  Plaintiff stated that he had declined to go to the hospital to support his friend during the wife's illness, because the hospital reminded him of his father, but he was interested in finding other ways to support his friend. (293)

[25]A bony growth attached to a ligament.

space narrowing especially L3-L4 level.  Findings suggest DISH." *Id*.  An x-ray of

Plaintiff's right knee showed "moderate degenerative changes" (280), while an x-ray of

the left knee showed an "old gunshot wound injury but minimal degenerative change."

(281).

On March 28, 2011, Plaintiff told Dr. Kumar that his back pain was "in control"

with ibuprofen, and was not restricting his activities of daily living. (276)  Kumar advised

Plaintiff to exercise and lose weight. (277)

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the

Commissioner of Social security as to any fact, if supported by substantial evidence,

shall be conclusive."  The issue to be determined by this Court is whether the

Commissioner's conclusions "are supported by substantial evidence in the record as a

whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

The SSA has promulgated administrative regulations for determining when a
claimant meets this definition.  First, the SSA considers whether the claimant is
currently engaged in substantial gainful employment.  If not, then the SSA
considers whether the claimant has a "severe impairment" that significantly limits

21

the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

Under the regulations, a treating physician's opinion is entitled to controlling

weight, provided that it is well-supported in the record:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2).  However, "[w]hen other

substantial evidence in the record conflicts with the treating physician's opinion . . .  that

opinion will not be deemed controlling.   And the less consistent that opinion is with the

record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d

Cir. 1999)(*citing* 20 C.F.R. § 404.1527(c)(4), formerly designated as 20 C.F.R. §

404.1527(d)(4)).  Nevertheless,

[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527[(c)](2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating

22

> source's opinion.' *Id.*; *accord* 20 C.F.R. § 416.927[(c)](2); *see also Schaal*,
> 134 F.3d at 503-504 (stating that the Commissioner must provide a
> claimant with "good reasons" for the lack of weight attributed to a treating
> physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  However, an ALJ is not required

to explicitly discuss each factor, as long as his "reasoning and adherence to the

regulation are clear." *Atwater v. Astrue*, 512 Fed. Appx. 67, 70, 2013 WL 628072 at *2

(2d Cir. Feb. 21, 2013) ("Atwater challenges the ALJ's failure to review explicitly each

factor provided in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of

each and every factor where the ALJ's reasoning and adherence to the regulation are

clear.") (citation omitted).

Administrative Law Judges are required to evaluate a claimant's credibility

concerning pain according to the factors set forth in the Commissioner's regulations,

which state, in relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence. By objective medical evidence, we mean medical signs and
> laboratory findings as defined in § 404.1528 (b) and (c). By other
> evidence, we mean the kinds of evidence described in §§ 404.1512(b)(2)
> through (8) and 404.1513(b)(1), (4), and (5), and (d). These include
> statements or reports from you, your treating or nontreating source, and
> others about your medical history, diagnosis, prescribed treatment, daily
> activities, efforts to work, and any other evidence showing how your
> impairment(s) and any related symptoms affect your ability to work. We
> will consider all of your statements about your symptoms, such as pain,
> and any description you, your treating source or nontreating source, or
> other persons may provide about how the symptoms affect your activities
> of daily living and your ability to work.
>
> ***

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).  However, while an ALJ is

required to consider these factors, he is not required to explicitly discuss each one.[26]  If

it appears that the ALJ considered the proper factors, his credibility determination will

---

[26] *See, Pellam v. Astrue*, 508 Fed.Appx. 87, 91, 2013 WL 309998 at *3 (2d Cir. Jan. 28, 2013) ("The ALJ did not apply an incorrect legal standard when judging the credibility of Pellam's testimony. Although the ALJ did not explicitly discuss all of the relevant factors, Pellam has failed to point to any authority requiring him to do so. In any event, the ALJ cited the applicable regulation, 20 C.F.R. § 404.1529, explicitly mentioned some of the regulatory factors (such as Pellam's limited use of pain medication), and stated that he considered all of the evidence required by § 404.1529.").

be upheld if it is supported by substantial evidence in the record.[27]

THE ALJ'S DECISION

On March 16, 2012, the ALJ issued the decision that is the subject of this action. (48-59).  At the first step of the five-step sequential analysis described above, the ALJ found that Plaintiff had "not engaged in substantial gainful employment since December 30, 2010, the application date." (50)  At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease of the lumbar spine; hypertension; obesity and depression" (50)  The ALJ specifically found that Plaintiff's claimed "mental retardation" was "non-severe." *Id*.  At step three of the five-step analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (50-53)

Prior to reaching step four of the analysis, the ALJ determined that Plaintiff had the following RFC:

> [C]laimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b) except he is limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling; and he is limited to work that requires only simple instructions and simple decisions.

(53)

At step four of the five-step analysis, the ALJ found that Plaintiff was unable to perform any past relevant work. (57)  However, at step five of the analysis, the ALJ found, based on testimony from a vocational expert, that with the RFC set forth above Plaintiff could still perform other jobs in the national economy. (57-58)  Specifically, the

---

[27]*Id*.

ALJ found that Plaintiff could perform at least three light unskilled jobs: assembler of small products, DOT 729.687-030, garment sorter, DOT 222.687-014, and hand packager, DOT 559.687-074. (58)

## DISCUSSION

### Whether Plaintiff's Intellectual Disability is Severe

Plaintiff maintains that the ALJ erred at step-two of the sequential analysis by finding that Plaintiff's intellectual impairment is not severe.  Plaintiff further contends that the ALJ failed to include such impairment in the RFC assessment.  Putting aside the first argument, the Court does not agree that the ALJ failed to include such impairment in the RFC.  To the contrary, the ALJ indicated that he was giving "great weight" to Jean-Jacques' opinion that Plaintiff's "attention and concentration was mildly impaired as a result of limited intellectual functioning," and that he therefore "adopted limitations to claimant's residual functional capacity for work that requires simple instructions and decisions." (56)

As for the first argument, the Court finds that the ALJ's determination is supported by substantial evidence.  In that regard, as already discussed, the medical evidence consistently indicates that Plaintiff's intellectual disability is mild.  Indeed, many of the treatment providers who performed mental status examinations, including Dr. McIntyre, observed no cognitive deficits.  However, even assuming *arguendo* that the ALJ erred by failing to classify Plaintiff's limited intellectual function as severe, such error was harmless in light of the fact that the ALJ included a thorough discussion of such impairment at step 3, and factored the impairment into the RFC.

26

<u>Whether Plaintiff Meets Listing 12.05(B) or (C)</u>

Plaintiff contends that he has a listed impairment under either 12.05(B) or

12.05(C).  As for 12.05(B), Plaintiff's contention is premised on the assertion that he

received a score of 51 on the WISC.  However, as the Court has already indicated, that

assertion is not supported by substantial evidence in the record.  The contemporaneous

test result form shows no numeric score for the WISC, and to the extent Plaintiff

received a letter score of "E," it is unclear what that means.[28]  Accordingly, Plaintiff's

argument concerning Listing 12.05(B) lacks merit.

Plaintiff's argument concerning Listing 12.05(C) requires much more discussion.

Section 12 of 20 CFR Pt. 404, Subpart P, Appendix 1, deals with Mental Disorders.

Listing 12.05 consists of "an introductory paragraph with the diagnostic description for

intellectual disability," and then "four sets of criteria (paragraphs A through D)." *Id*.  To

satisfy the requirements of Listing 12.05, a claimant must meet *both* "the diagnostic

description in the introductory paragraph *and* any one of the four sets of criteria." *Id*.

(emphasis added)  In this action, Plaintiff claims to meet 12.05(B) and 12.05(C), but the

Court has already found that 12.05(B) does not apply, and therefore the only question

is whether Plaintiff meets both the diagnostic description in the introductory paragraph

and the paragraph (C) criteria.  Listing 12.05 states, in pertinent part, as follows:

> 12.05 Intellectual disability: Intellectual disability refers to significantly
> subaverage general intellectual functioning with deficits in adaptive
> functioning initially manifested during the developmental period; i.e., the
> evidence demonstrates or supports onset of the impairment before age

---

[28]*See*, Pl. Memo of Law [#9-1] at p. 3, n. 6 ("Standardized IQ scores are generally reported numerically, based on [a] mean score of 100.  It is not clear from the record why the  RCSCD referred to letter ratings.") (citation omitted)

22.

The required level of severity for this disorder is met when the
requirements in . . .   C . . . are satisfied.
***
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a
physical or other mental impairment imposing an additional and significant
work-related limitation of function;

*Id*. Consequently, for Plaintiff to meet this listing he must had "significantly subaverage

general intellectual functioning with deficits in adaptive functioning" before age 22, as

well as both a valid IQ score between 60 and 70 and additional and significant work-

related limitation.

At the outset, it is clear that in addition to Plaintiff's intellectual impairment, he

has "additional and significant work-related limitations."  Specifically, the ALJ found, at

step two of the sequential analysis, that Plaintiff had the following severe impairments:

"degenerative disc disease of the lumbar spine; hypertension; obesity and depression."

(50)  Such a finding of severity at step 2 of the sequential analysis satisfies the

"additional and significant" requirement of Listing 12.05(C).  *See*, 20 CFR Pt. 404,

Subpart P, Appendix 1, § 12 ("For paragraph [12.05]C, we will assess the degree of

functional limitation the additional impairment(s) imposes to determine if it significantly

limits your physical or mental ability to do basis work activities, i.e., is a 'severe'

impairment(s), as defined in § § 404.1520(c) and 416.920(c).")  Nevertheless, the ALJ

found that Plaintiff did *not* have such an additional and significant impairment (53),

which was error.  Such error does not require remand, however, unless Plaintiff

otherwise meets the requirements of Listing 12.05(C).

28

Accordingly, the only remaining questions are whether Plaintiff had "significantly subaverage general intellectual functioning with deficits in adaptive functioning" before age 22, as well as a valid IQ score between 60 and 70.  The ALJ answered both questions in the negative (50, 52-53), and the Court finds that those determinations are supported by substantial evidence.

To begin with, although the ALJ did not expressly state that Plaintiff did not have "significantly subaverage general intellectual functioning with deficits in adaptive functioning" as part of his discussion of Listing 12.05(C), it is clear to this Court that the ALJ implicitly made such a determination, as shown by the entire decision, including the discussion at step two of the sequential analysis, which found that Plaintiff's intellectual impairment imposed only "minimal, if any, functional limitations." (50)  The ALJ also discussed Plaintiff's wide variety of daily activities. (51, 56)  The Court agrees that Plaintiff's ability to live independently belies his contention that he has deficits in adaptive functioning. *See, Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) ("If one is able to satisfactorily navigate activities such as living on one's own, taking care of children without help sufficiently well that they have not been adjudged neglected, paying bills, and avoiding eviction, one does not suffer from deficits in adaptive functioning.") (citations and internal quotation marks omitted)

Plaintiff nevertheless suggests that he has adaptive deficits, since he really cannot function on his own without his mother's assistance.  This argument, though, is at odds with the record, which, for example, shows that Plaintiff was able to move from Florida to Rochester and care for his elderly, wheelchair-bound father for several years, because there was no one else available to do so. (15)  According to Plaintiff, such care

29

included handling his father's medications. *Id*.   Additionally, Plaintiff's contention that his mother must perform household chores for him is contradicted by statements that he made to various doctors and examiners that he performed those chores himself. Notably, it appears that the "support" that Plaintiff received from his mother consisted primarily of moral support that he derived from visiting with her and speaking to her on the telephone twice a day. *See,e.g.*, (286) ("Reports he maintains contact with his mother which is helpful for him.")

As for the IQ portion of Listing 12.05(C), while Plaintiff took the WISC IQ test, he was not given a numeric score, although a school psychiatrist indicated that the WISC results showed that Plaintiff was "at the level of the mentally retarded." (186)  Plaintiff also took the WRAT, for which he received numeric scores, and the same psychologist indicated that those WRAT scores were "commensurate with the WISC finding." *Id*. However, while the WISC and the WRAT each measure an aspect of cognitive ability, the Commissioner's Regulations indicate that the WRAT is a standardized measure of "academic achievement," not of IQ. 20 CFR Pt. 404, Subpt. P, App. 1, § 112(C)(3).  On that point, it is worth reiterating that Plaintiff himself previously argued to the Appeals Council that the WRAT scores were not a valid indicator of his IQ. *See*, Pl. Brief to the Appeals Council (187) ("The WISC test is an acceptable standardized test for IQ *not the WRAT*.") (emphasis added)  Accordingly, the WRAT scores do not establish that Plaintiff has an IQ between 60 and 70, as required by Listing 12.05(C).

As an aside, the ALJ criticized the validity of Plaintiff's WRAT scores, finding them to be invalid, for two reasons:  first, because it appeared that the test was

30

administered to Plaintiff in English, and second, because the WRAT was not an

appropriate test for someone like Plaintiff whose cultural background was non-English

speaking. Specifically, the ALJ stated in pertinent part:

> The WRAT scores are questionable, considering the fact that the claimant
> was deficient enough in English language proficiency to require the
> psychologists to administer a Spanish language version of WISC.  In this
> case, an individual such as the claimant with a cultural background that is
> not principally English speaking would be better measured by alternative
> testing, such as the Test of Nonverbal Intelligence, Leiter International
> Performance Scale- Revised, or Peabody Picture Vocabulary Test.  Here,
> the WRAT scoring validity is called into question since the claimant's
> English proficiency necessitated the use of a Spanish WISC, yet the
> WRAT test was administered to an individual with inadequate English
> proficiency.

(52-53)  From this discussion, it appears that the ALJ believed that the WRAT was

administered in English, which would, presumably, have affected the test's validity since

Plaintiff spoke very little, if any, English at the time and was considered illiterate in

English.  Such an assumption is not unreasonable, since the testing report specifically

indicates that the WISC was given in Spanish, but does not make the same claim about

the WRAT.  On the other hand, it seems unlikely that the school would have

administered a test in English to a student who could not understand English, or, if they

had, that the student would have scored as well as Plaintiff did.  The ALJ further found

that a different test would have been more appropriate for someone with Plaintiff's

background, and that observation is supported by the applicable provision of the CFR,

which make the same observation with regard to IQ tests:

> Generally, it is preferable to use IQ measures that are wide in scope and
> include items that test both verbal and performance abilities. However, in

special circumstances, such as the assessment of individuals with sensory, motor, or communication abnormalities, *or those whose culture and background are not principally English-speaking*, measures such as the Test of Nonverbal Intelligence, Third Edition (TONI–3), Leiter International Performance Scale–Revised (Leiter–R), or Peabody Picture Vocabulary Test--Third Edition (PPVT–III) may be used.

20 CFR Pt. 404, Subpt. P, App. 1 § 12 (emphasis added).

In any event, with regard to evidence of Plaintiff's IQ, the ALJ further indicated that he gave great weight to the findings of Jean-Jacques, who opined that Plaintiff's intellectual functioning was in the borderline range of 71-84 (240), which is too high to satisfy the IQ requirement of Listing 12.05(C).  The Court notes that Dr. Kumar made the same finding (229), and that other examiners, including McIntyre, repeatedly indicated that Plaintiff showed no cognitive deficits during mental status examinations. For all of the foregoing reasons, the Court finds that the ALJ's determination that Plaintiff did not satisfy the IQ requirement of Listing 12.05(C) is supported by substantial evidence.

However, even assuming *arguendo* that the ALJ's decision on that point was erroneous, the Court reiterates that the ALJ's determination that Plaintiff fails to otherwise meet the requirements of Listing 12.05(C), because he does not meet the listing's threshold requirement of having ""significantly subaverage general intellectual functioning with deficits in adaptive functioning," is supported by substantial evidence, and therefore independently required a finding at step three of the sequential analysis that Plaintiff does not have a listed impairment.

<u>Whether the ALJ's Hypothetical Questions to the VE accurately</u>
<u>represented Plaintiff's RFC</u>

Plaintiff maintains that the hypothetical questions which the ALJ posed to the VE "failed to include ... the significant limitations caused by [Plaintiff's] intellectual disability" and his illiteracy.[29]  With regard to intellectual disability, Plaintiff contends that the ALJ's questioning of the VE "failed to take into account . . .  [Jean-Jacques'] opinion that [Plaintiff's] attention and concentration were mildly impaired by his intellectual functioning and/or his depression."[30]

As to this point, the ALJ did not include specific limitations for attention and concentration in his RFC determination, but he did indicate that Plaintiff was "limited to doing work only requiring simple instructions, simple decisions." (30)  The question, then, is whether the ALJ's decision not to include specific limitations for attention and concentration in the RFC requires reversal.  The Court answers that question in the negative.

To begin with, Plaintiff's school records specifically indicate that he had good attention and concentration. (186) ("Although his brother was involved in a problem just in front of the Office, Jose kept working without being distracted.").  Moreover, apart from Jean-Jacques, none of the medical professionals who examined Plaintiff, numerous times over the course of several years, commented on any deficiencies in his attention or concentration.

_____

[29]Plaintiff's Memo of Law [#9-1] at pp. 25-26.

[30]Id. at p. 26.  At the hearing, Plaintiff's representative did not object to that aspect of the ALJ's hypothetical, nor did she include such limitation in the hypothetical that she posed to the VE on cross-examination. (32)

Nevertheless, the ALJ agreed with Jean-Jacques that Plaintiff has a certain amount of difficulty with "concentration, persistence or pace," consisting of "some difficulty remembering what someone tells him to do" and "some difficulty focusing on tasks." (51); see also, (56) ("His attention and concentration was mildly impaired as a result of limited intellectual functioning.")  Furthermore, the ALJ accounted for that fact by limiting Plaintiff to work requiring simple instructions and decisions (56).  Such RFC description was sufficient to account for Plaintiff's limitations in attention and concentration:

> While the Second Circuit has not directly addressed the issue of whether "an ALJ's hypothetical question to a vocational expert must specifically account for limitations in concentration, persistence and pace, other courts that have addressed the issue have answered in the affirmative." *McIntyre v. Colvin*, No. 3:12–CV–0318 (GTS), 2013 WL 2237828, at *4 (N.D.N.Y. May 21, 2013); *see also Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir.2011) (collecting cases). There is, however, no *per se* requirement that an ALJ's hypothetical questions must "expressly parrot the language of [the special technique outlined in] 20 C.F.R. § 404.1520a and 416.920a in all cases." *See Marquez*, 2013 WL 5568718, at * 17. Thus, "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *See id.* at *17 (*quoting Winschel*, 631 F.3d at 1180); McIntyre, 2013 WL 2237828, at *4 (same).

*Rivera v. Colvin*, No. 11 Civ. 7469(LTS)(DF), 2014 WL 2440718 at *39 (S.D.N.Y. May 30, 2014); *see also, Rosario v. Astrue*, No. 3:11cv00314(MRK)(WIG), 2012 WL 3728143 at *7 (D.Conn. Feb. 13, 2012) ("[T]he ALJ did not completely discount Plaintiff's limitations with regard to concentration, persistence, and pace. She included

in the first hypothetical the limitations that the individual would be limited to simple, routine, repetitive tasks, involving short, simple instructions in an environment with few workplace changes and no fixed time or production requirements.")  Accordingly, the Court denies Plaintiff's objection on this point.

> Whether there was a conflict between the VE's testimony and the DOT, and if so, whether the ALJ Provided a Reasonable Explanation for his reliance on the VE's testimony

Plaintiff further maintains that the VE's testimony, that Plaintiff could perform the three jobs identified above, conflicts with the DOT's description of those jobs. Specifically, Plaintiff notes that according to the DOT, the jobs of "assembler," DOT 739.687-030, "garment sorter," DOT 222.687-014, and "inspector and hand packager," DOT 559.687-074, each require a reasoning level of 2, which is defined as:

> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

Plaintiff further observes that "garment sorter" requires a mathematical development level 2, which is defined as:

> Add, subtract, multiply and divide all units of measure.  Perform the four operations with like commons and decimal fractions.  Compute ratio, rate, and percent.  Draw and interpret bar graphs.  Perform arithmetic operations involving  all American monetary units.

And finally, Plaintiff notes that the job of  "hand packager" requires a language development level 2, which is defined as:

> Reading: Passive vocabulary of 5,000 - 6,000 words.  Read at rate of 190-215 words per minute.  Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling and pronunciation.

> Read instructions for assembling model cars and airplanes.  Writing:
> Write compound and complex sentences, using cursive style, proper
> punctuation, and employing adjectives and adverbs.  Speaking:  Speak
> clearly and distinctly with appropriate pauses and emphasis, correct
> pronunciation, variations in word order, using present, perfect, and future
> tenses.

Plaintiff argues that all of those requirements exceed the abilities that are set forth in

the RFC.  Consequently, Plaintiff maintains that there is an inconsistency between the

DOT and the VE's testimony, and that pursuant to SSR 00-04p, the ALJ had a duty to

explain the inconsistency.  Significantly, Defendant did not address this point in her

responsive papers,[31] and Plaintiff's argument is therefore unopposed.

In that regard, Social Security Ruling 00-4p, upon which Plaintiff relies, indicates

that it was issued to

> emphasize[ ] that before relying on VE . . . evidence to support a disability
> determination or decision, [ALJs] must: Identify and obtain a reasonable
> explanation for any conflicts between occupational evidence provided by
> VEs . . . and information in the Dictionary of Occupational Titles (DOT) . . .
> and explain in the determination or decision how any conflict that has
> been identified was resolved.

SSR 00-4p.  In this case, the ALJ did not identify any conflict between the VE's

testimony and the DOT, and therefore provided no explanation for any such conflict.  As

to this point, the VE did not tell the ALJ what the reasoning, math and language

requirements were for the jobs she identified, and neither the ALJ nor Plaintiff's

representative asked the VE about them.[32]   Nevertheless, it appears that there may be

---

[31] *See*, Def. Reply [#12].

[32] Further to that point, the VE's entire testimony at the hearing was quite brief as compared to
what the Court is used to seeing in disability cases.

a conflict between the RFC, the VE's testimony and the DOT, particularly with respect to the educational requirements for math and language.  Since Defendant has provided no clarification, the Court will remand the action for further development of the record on this point, namely, whether a claimant with an RFC as determined by the ALJ can meet the educational requirements for the jobs which the VE identified, and if not, whether there are other jobs which such a claimant could perform.

Whether the ALJ's determination that Plaintiff can communicate in English is supported by substantial evidence

Plaintiff also contends that the ALJ improperly discounted purported testimony by the VE that Plaintiff could not perform the three jobs identified earlier if Plaintiff was illiterate. *See*, Pl. Memo of Law [#9-1] at p. 26 ("The VE testified that [Plaintiff] would not be able to perform the jobs suggested if he were illiterate in Spanish and English.") According to Plaintiff, the ALJ improperly determined that he was literate, based upon both Plaintiff's WRAT scores and upon the ALJ's own observations that Plaintiff could understand some English. *Id*.

As to this issue, the VE did not indicate that Plaintiff needed to be literate to perform those jobs.  Instead, the VE indicated that a hypothetical claimant could perform the three jobs identified, even if he was unable to read or write in any language, notwithstanding that the jobs had an SVP of 2. (32) ("The jobs I named, your Honor, were simple, unskilled [INAUDIBLE] So as far as jobs that I named that would *not* prevent the person from doing the job.") (emphasis added)[33]  However, the VE also

---

[33]The Commissioner has indicated that an ability to speak English is not necessarily significant with regard to unskilled jobs such as those identified here by the VE. *See*, 20 C.F.R. Pt. 404, Subpt. P, App. 2 at § 202.00(g) ("While illiteracy or the inability to communicate in English may significantly limit an

indicated that the hypothetical claimant would need to at least be able to communicate a "minimum" amount in English. *Id*. On this point, Plaintiff's brief accurately summarizes the VE's testimony:

> [Plaintiff's representative] asked the VE if a person who could not read or write in any language would be able to perform the jobs listed above, which had an SVP of two. The VE clarified whether such a claimant would be illiterate. Her answer is somewhat unclear, but she seemed to testify that if a claimant could recognize short words and sign his name, he would be able to perform the jobs. But if he had 'no language skills' and could not communicate in English, he could not.

Pl. Mem of Law [#9-1] at p. 14. The ALJ found, based upon Plaintiff's WRAT scores and upon his own observation of Plaintiff at the hearing, that Plaintiff has such a minimum ability to communicate:

> The record shows the claimant is at a minimum able to read, spell, and perform arithmetic at grade school levels between grade two and grade four (Ex. 11E). Moreover, the undersigned observed the claimant responding to questioning, posed in English, before the translator provided the question to the claimant in Spanish.

(58)

Plaintiff contends that this finding by the ALJ was erroneous for two reasons. First, Plaintiff contends that the ALJ should not have cited the WRAT scores, since "it is not clear that the WRAT was administered in English."[34] However, as to this argument, the Court finds that, even assuming that the WRAT was administered in Spanish, such

---

individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance.")

[34]Pl. Memo of Law [#9-1] at p. 26.

fact does not render the ALJ's finding incorrect, since the VE was asked to consider the effect if the hypothetical claimant was unable to read or write in "any language," not just English.  The VE was not asked to consider whether the claimant could perform the jobs if he was literate in Spanish but not English.  More importantly as just discussed above, the issue, according to the VE, is not whether the claimant is "literate" in either English or Spanish, but whether the claimant has a "minimum" ability to communicate in English, even if that involves knowing only some "short words." (32)

Second, Plaintiff contends that the ALJ should not have relied on his own observations regarding Plaintiff's ability to understand English.  For support, Plaintiff cites *Bazikian v. Colvin*, No. 1:12–CV–0664 (LEK), 2014 WL 943410 at *6 (N.D.N.Y. Mar. 11, 2014), in which the district court held that an ALJ had improperly relied on his own observations, made during the hearing, concerning the claimant's alleged mental impairments.[35]  However, the Court finds that *Bazikian* is factually inapposite because, here, the ALJ was not attempting to diagnose the claimant, but instead, he merely made an observation of observable fact, namely, that Plaintiff apparently understood the questions being posed in English, since he began answering before the translator had translated the question.  ALJs are permitted to make such observations.[36]

---

[35] *See, id.* ("The ALJ largely ignored the substantial evidence suggesting that Plaintiff struggles with more than mild limitation in concentration, persistence, or pace. The ALJ discredited the evidence because, at the hearing, Plaintiff 'was responsive to questions and displayed no evidence of a learning or communication deficit," and because the ALJ believed that Plaintiff "sought psychological treatment in anticipation of his social security case.'")

[36] *See, Cruz v. Astrue*, 941 F.Supp.2d 483, 497-498 (S.D.N.Y. 2013) ("Cruz argues that ALJ Solomon incorrectly assessed her ability to speak English by relying solely on his firsthand experience of communicating with her at the hearing and by noting that "during the hearing, ... Cruz began to respond to some questions asked without having the questions interpreted." Pl. Mem. at 13–15. This argument fails. ALJ Solomon found that Cruz was "able to communicate in English," citing 20 C.F.R. 416.964. R. 179. That regulation, which requires that *498 a claimant's ability to communicate in English be considered as a

For example, SSR 96-8P, entitled "Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims," states, in pertinent part, that an ALJ's RFC assessment may include "the adjudicator's personal observations, if appropriate," but that "[i]n instances in which the adjudicator has observed the individual, he or she is not free to accept or reject the individual's complaints *solely* on the basis of such personal observations." (emphasis in original)  Moreover, in this case, the ALJ's personal observations are not the only evidence that Plaintiff has some ability in the English language.  Significantly, Hall, the therapist who saw Plaintiff on more occasions than anyone else, reported that Plaintiff was "*mainly* Spanish speaking" (202) (emphasis added), which, in the Court's view, strongly suggests that he was also able to speak in English to some degree, since there would have been no other reason to used the word "mainly."  Moreover, it appears that on at least one occasion, Plaintiff indicated, in English, that his back pain was "so-so," since that phrase is in quotation marks in the medical notes. (276)  Additionally, the record indicates that Plaintiff was supposed to be learning English as part of his IEP at the Rochester City School District. (183)

---

factor relating to her ability to work, refers only to a claimant's ability to "speak and understand English," 20 C.F.R. 416.964(b)(5), an ability that the ALJ observed firsthand as well as one that was supported in the record."); *see also, Singmuongthong v. Astrue*, No. 1:09cv01328 DLB, 2010 WL 3715152 at *13 -14 (E.D.Cal. Sep. 17, 2010) ("The ALJ also discounted Plaintiff's credibility based on observations at the hearing, noting that Plaintiff stated that she did not even speak enough English to understand directions, but answered one of his questions before the interpreter translated it. AR 38. An ALJ's observations during the hearing, along with other evidence, constitutes substantial evidence. *See Drouin v. Sullivan*, 966 F.2d 1255, 1258–59 (9th Cir.1992). Plaintiff argues that there is no evidence that the ALJ speaks Laotian or Thai, so he does not know whether Plaintiff answered his question or spoke to the interpreter on another matter. This argument assumes that Plaintiff did not answer in English or that the interpreter may not have immediately translated Plaintiff's answer. There is no indication that either of these assumptions is correct.")

However, the ALJ devoted only a single sentence to the issue of whether Plaintiff has a "minimum grasp" of English. (58)[37]  Furthermore, that single sentence pertains only to the ALJ's observations, and not to the other evidence concerning Plaintiff's ability to speak English which the Court just identified.  Consequently, the Court finds that since this matter is being remanded anyway, the ALJ should further develop the record on this point, namely, the extent to which Plaintiff can speak and understand English.  In that regard, it may be particularly helpful to contact Hall to seek clarification of her comment that Plaintiff "mainly" speaks Spanish, and to ascertain from her the extent to which she has been able to communicate with Plaintiff in English, if at all.  It will also be helpful to obtain more detailed testimony from the VE concerning the quantity of English that would constitute the "minimum" ability to speak English about which she testified.

## CONCLUSION

Plaintiff's application [#9] is granted, defendant's application [#10] is denied, and this matter is remanded to the Commissioner for further administrative proceedings, pursuant to 42 U.S.C. § 405(g), sentence four.  It appears that the rapidity with which such further proceedings occur could have an effect on the outcome of this matter since Plaintiff is fast approaching his fiftieth birthday, which would move him into the

---

[37]On this same point, to the extent the ALJ was also basing his ruling on an assumption that Plaintiff took the WRAT in English (58), it would mean that the ALJ actually devoted two sentences to this issue, not one.  However, as already discussed, it seems unlikely, given the entire record, that Plaintiff took the WRAT in English.

category of "persons closely approaching advanced age" under the grids.[38]   The Clerk

of the Court is directed to close this action.

        So Ordered.

Dated: Rochester, New York
            August 6, 2014                   ENTER:


                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge

---

[38]*See*, 20 C.F.R. § 416.969a(d) ("If your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength and demands of jobs other than the strength demands, we will not directly apply the rules in appendix 2 *unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations*; otherwise the rules provide a framework to guide our decision.") (emphasis added); *see also, Calvo v. Bowen*, No. 87 CIV 7352 (LBS),1988 WL 87507 at *4 (S.D.N.Y. Aug. 18, 1988) (Indicating that on remand the ALJ applies the grid rules that apply to the claimant based on his then-current age)